UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NITETEK LICENSING LLC,<br><br>      Plaintiff,<br><br>v.<br><br>EVBOX NORTH AMERICA INC.,<br><br>      Defendant. | CASE NO. 1:21-cv-04738-DLC<br><br>PATENT CASE<br><br>JURY TRIAL DEMANDED |

**DEFENDANT EVBOX NORTH AMERICA INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS FOR
FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

I. STATEMENT OF THE ISSUE ................................................................................. 2

II. STATEMENT OF THE FACTS ............................................................................... 2

III. ARGUMENT .............................................................................................................. 4

    A. This Case Should Be Disposed of at the Pleading Stage. ......................................... 4

    B. The Law of 35 U.S.C. § 101. .................................................................................... 5

    C. The Asserted Patent is Invalid under 35 U.S.C. § 101. ............................................ 6

        1. Claim 3 of the '783 Patent is representative. ................................................6

        2. *Alice* Step 1: Claim 3 of the '783 Patent is directed to the abstract idea of using longer codes to increase capacity during wireless communications..........7

        3. *Alice* Step 2: The claims of the '783 Patent do not contain an inventive concept to transform the abstract idea into patent-eligible subject matter. .......11

        4. There are no claim construction or factual disputes preventing a ruling on this issue at the Rule 12 stage. ...............................................................................14

IV. CONCLUSION ......................................................................................................... 15

# TABLE OF AUTHORITIES
Page(s)

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014) ............................................................................................. 5, 6, 7, 11

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
    966 F.3d 1347 (Fed. Cir. 2020) (Chen, J., concurring) .................................................... 9

*Ancora Techs. v. HTC Am., Inc.*,
    908 F.3d 1343 (Fed. Cir. 2018) ..................................................................................... 10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................................ 4

*Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*,
    687 F.3d 1266 (Fed. Cir. 2012) ....................................................................................... 5

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................................ 4

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018) ................................................................................ 14, 15

*Bilski v. Kappos*,
    561 U.S. 593 (2010) ........................................................................................................ 5

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014) ................................................................................... 7, 13

*Core Wireless Licensing S.A.R.L. v. LG Elec., Inc.*,
    880 F.3d 1356 (Fed. Cir. 2018) ....................................................................................... 9

*Cuvillier v. Taylor*,
    503 F.3d 397 (5th Cir. 2007) ........................................................................................... 4

*Data Engine Techs. LLC v. Google LLC*,
    906 F.3d 999 (Fed. Cir. 2018) ......................................................................................... 9

*Diamond v. Chakrabarty*,
    447 U.S. 303 (1980) ........................................................................................................ 5

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) ............................................................................ 10, 11, 13

*Epic IP LLC v. Backblaze, Inc.*,
    351 F. Supp. 3d 733 (D. Del. 2018) (Bryson, J.) ......................................................... 2, 8

*Finjan, Inc. v. Blue Coat System, Inc.*,
 879 F.3d 1299 (Fed. Cir. 2018) ................................................................................8

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
 298 F.R.D. 116 (S.D.N.Y. 2014) ..............................................................................4

*McRO, Inc. v. Bandai Namco Games Am., Inc.*,
 837 F.3d 1299 (Fed. Cir. 2016) ................................................................................9

*Morales v. Square, Inc.*,
 75 F. Supp. 3d. 716 (W.D. Tex. 2014), *aff'd*, 621 F. App'x 660 (Fed. Cir. 2015), *cert. denied*,
 136 S. Ct. 1461 (2016) ..............................................................................................7

*PPS Data, LLC v. Jack Henry & Assocs., Inc.*,
 No. 2:18-cv-00007-JRG, 2019 WL 1317286 (E.D. Tex. Mar. 21, 2019) .................7

*RecogniCorp, LLC v. Nintendo Co., Ltd.*,
 855 F.3d 1322 (Fed. Cir. 2017) ................................................................................9

*SAP Am., Inc. v. InvestPic, LLC*,
 898 F.3d 1161 (Fed. Cir. 2018) ................................................................................7

*In re TLI Commc'ns LLC Patent Litigation*,
 823 F.3d 607 (Fed. Cir. 2016) ................................................................................12

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
 874 F.3d 1329 (Fed. Cir. 2017) ................................................................................9

*Ultramercial, Inc. v. Hulu, LLC*,
 772 F.3d 709 (Fed. Cir. 2014) (Mayer, J., concurring) .......................................5, 11

*Yanbin Yu, et al. v. Apple Inc. et al*,
 Case Nos. 2020-1760, 2020-1803 (Fed. Cir. June 11, 2021) .................................13

## Statutes

35 U.S.C. § 101 ............................................................................................... *passim*

## Other Authorities

Fed. R. Civ. P. 12(b)(6) ..................................................................................2, 4, 14

The idea of using longer codes to increase capacity during wireless communications is an abstract concept ineligible for patent protection. The claims of the '783 Patent are directed to this abstract concept and do not claim any inventive concept sufficient to confer patent eligibility on the claimed abstract idea.

Wireless communication has been achieved using spread-spectrum CDMA systems for years. In CDMA systems, several users can share bandwidth by transmitting data simultaneously over a single wireless channel. To permit sharing a channel between users, CDMA assigns spreading codes to transmitters to differentiate the data transmitted by each transmitter. The '783 Patent explains that in prior art CDMA systems, hierarchic orthogonal codes were used to expand the capacity of CDMA systems. But, as the patent explains, there existed a capacity problem in asymmetric communications in which only the mobile devices transmit data to the base station on the uplink channel. That's because the base station still needs to send power control signals to the mobile devices on the downlink channel, which would require the use of spreading codes. Because some of the codes are used for power control signals sent on the downlink channel, there could be a shortage of spreading codes for uplink data transmission even when there is no capacity problem. The '783 Patent's purported solution to this problem is to use hierarchic orthogonal spreading codes for the asymmetric communications that are longer length than spreading codes used for symmetric communications. But the claims do not provide any specific way of accomplishing this idea. In essence, the applicants thought, "Wouldn't it be beneficial to provide more capacity by using longer spreading codes for asymmetric CDMA communications?" They then claimed precisely that concept.

Thus, the '783 Patent's applicants did not claim an unconventional system to solve the problem they identified. Nor did they claim a particular mechanism for improving computing

systems. Claims that "recite the concept, but not the way to implement it," are ineligible for patenting. *Epic IP LLC v. Backblaze, Inc.*, 351 F. Supp. 3d 733, 740 (D. Del. 2018) (Bryson, J.). The '783 Patent simply claims an abstract concept, not a specific implementation of that concept. Its claims are therefore invalid for failure to claim patent-eligible subject matter.

Resolving this issue does not require discovery or formal claim construction. To avoid waste of judicial and party resources unnecessarily litigating an invalid patent, EVBox thus requests that the Court dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

## I. STATEMENT OF THE ISSUE

Abstract ideas are ineligible for patentability under 35 U.S.C. § 101, absent an inventive concept that amounts to significantly more than the abstract idea. The claims of the '783 Patent are directed to the abstract idea of using longer codes to increase capacity during wireless communications. The '783 Patent does not include an inventive concept beyond that idea. Should the Court therefore dismiss Nitetek's claims pursuant to Rule 12(b)(6)?

## II. STATEMENT OF THE FACTS

The '783 Patent is titled, "CDMA transmission apparatus." It "relates to CDMA transmission apparatuses used for cellular systems such as digital car telephones and portable telephone." *See* '783 Patent, 1:6–7. The CDMA systems described in the '783 Patent were used for wireless communication long before the alleged invention claimed in the patent. *See id.*, 1:10–3:10. To permit sharing a channel between users, CDMA assigns spreading codes to transmitters to differentiate the data transmitted by each transmitter. Further, as the patent explains, in the prior art, "CDMA system use[d] codes with high orthogonality as spreading codes to suppress interference between spreading codes [to] allow[] the capacity of the system to be expanded." *Id.*,

3:11–14. Further, "[h]ierarchic type orthogonal codes such as Walsh codes [were] generated by combining generation matrices hierarchically . . . characterized by any two spreading codes in any hierarchy being mutually orthogonal." *Id.*, 3:39–42.

The patent explains that "communications whose information rate is asymmetric between the uplink and downlink, for example when information is only sent from the mobile station side are called 'asymmetric communications' and communications whose information rate is almost identical between the uplink and downlink are called 'symmetric communications.'" *Id.*, 3:53–59. The patent identifies the following problem in asymmetric communications:

> Now suppose a service which carries out information transmission only for the uplink and carries out no transmission for the downlink. Performing closed-loop transmission power control requires securing a spreading code to send a transmission power control bit for the downlink on which no information is transmitted.
>
> In this case, **since the spreading code resources of the downlink for closed-loop transmission power control are exhausted, when accommodating services of only downlink signals is attempted a problem occurs that accommodating those services fails because of a shortage of spreading codes even if there is no problem in terms of the system capacity**. Furthermore, trying to secure downlink spreading codes assuming that no transmission power control bits are transmitted means not performing transmission power control, which will deteriorate the quality of the uplink and deteriorate the system capacity of the uplink.

*Id.*, 3:62–65 (emphasis added). Thus, as the applicants explained, the goal of the alleged invention was to "to provide a CDMA communication apparatus in the CDMA cellular system that, even in asymmetric communications with only the uplink, for example, can avoid a shortage of spreading codes on the downlink while carrying out open-loop transmission power control on the uplink." *Id.*, 3:62–65. The '783 Patent's purported solution to this problem is recited in representative Claim 3:

> 3. A spreading code selection method, which selects as the spreading code for asymmetric communications, a hierarchic orthogonal type spreading code which is a spreading code of a hierarchy which contains spreading codes of a longer length than

3

spreading codes used for symmetric communication lines and is orthogonal to spreading codes used for other asymmetric communication lines.

*Id.*, Cl. 3. But, as the patent explains, the use of hierarchic orthogonal spreading codes was well-known in the prior art. *See, e.g.*, *id.*, 3:11–14; 3:39–42. So was the use of long spreading codes. *Id.*, 3:17–21 ("[I]n order to secure the number of spreading codes assigned to the user, a method of combining short codes which have the same cycle as the length of the information symbol and long codes which have longer cycle than that of short codes is adopted."); *see also id.*, 3:22–30. Consequently, the alleged invention claimed in the '783 Patent amounts to nothing more than using conventional methods to practice the idea of selecting even longer spreading codes for assymetric CDMA wireless communication.

### III. ARGUMENT

#### A. This Case Should Be Disposed of at the Pleading Stage.

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although factual allegations are taken as true, legal conclusions are given no deference. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting tenet of taking allegations as true in a motion to dismiss "is inapplicable to legal conclusions"). "On a 12(b)(6) motion to dismiss, a district court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, documents possessed by plaintiffs, or documents that plaintiffs knew about and relied upon." *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 122–23 (S.D.N.Y. 2014). "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief [as a matter of law], this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (internal

citations and quotations omitted).

Patentability under 35 U.S.C. § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Accordingly, the § 101 inquiry is properly raised at the pleadings stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718-19 (Fed. Cir. 2014) (Mayer, J., concurring). In those situations, claim construction is not required to conduct a § 101 analysis. *Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[W]e perceive no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101.").

**B.     The Law of 35 U.S.C. § 101.**

Section 101 of the Patent Act sets forth four categories of patentable subject matter: "any new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. Also, the law recognizes three exceptions to patent eligibility: "laws of nature, physical phenomena, and **abstract ideas**." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980) (emphasis added). Abstract ideas are ineligible for patent protection because a monopoly over these ideas would preempt their use in all fields. *See Bilski*, 561 U.S. at 611–12. In other words, "abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work." *Id.*, 653.

Determining whether a patent claim is impermissibly directed to an abstract idea involves two steps. First, the court determines "whether the claims at issue are directed to a patent-ineligible concept." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). Second, if the claim contains an abstract idea, the court evaluates whether there is "an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.*

C.     **The Asserted Patent is Invalid under 35 U.S.C. § 101.**

Nitetek's claims regarding the '783 Patent should be dismissed. The claims of the asserted patent are invalid under 35 U.S.C. § 101 because they fail both prongs of the *Alice* test. Each of the claims is directed to the abstract idea of using longer codes to increase capacity during wireless communications. Abstract ideas are not eligible for patenting. None of the claims contains an "'inventive concept' . . . sufficient to ensure that the patent in practice amounts to **significantly more** than a patent upon the ineligible concept itself." *See Alice*, 134 S. Ct. at 2355 (emphasis added).

1.     **Claim 3 of the '783 Patent is representative.**

Claim 3 of the '783 Patent is representative of the other claims because the claims contain the same essential elements. Specifically, all the independent claims include using longer length spreading codes for asymmetric transmission as compared to spreading codes used for symmetric transmission. In addition, Claims 1, 4, 6, 9, and 10 include the limitation that in asymmetric communications, using a lower transmission rate for known reference signals and transmission power control bits as compared to transmission rate used when symmetric communications are performed; Claims 1 and 4 include a base station and a mobile station; and Claims 6, 9, and 10 include a frame assembler, a transmission rate controller, and a spreading code determiner. And similar to representative Claim 3, dependent claims 2, 5, and 7 use hierarchical orthogonal spreading codes; and similar to representative Claim 3, dependent Claim 8 includes selecting a spreading code which is orthogonal to spreading codes used for other asymmetric communication lines. Similar to the claim limitations in the representative Claim 3, the additional claim limitations consist of generic components used for their conventional purpose, and thus, they do not alter the § 101 analysis.

Claim 3 is thus representative for the § 101 analysis. *See PPS Data, LLC v. Jack Henry & Assocs., Inc.*, No. 2:18-cv-00007-JRG, 2019 WL 1317286, at *5 (E.D. Tex. Mar. 21, 2019) (articulating that defendants first bear the burden of demonstrating a claim is representative, which then shifts to the plaintiff to identify a difference material to the § 101 analysis); *see also Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014).

  2.  ***Alice* Step 1: Claim 3 of the '783 Patent is directed to the abstract idea of using longer codes to increase capacity during wireless communications.**

In determining patent eligibility under § 101, the Court must first determine whether the claims are directed to an abstract idea. *Alice*, 134 S. Ct. at 2355. Under any plausible reading, the claims of the patent are directed to an unpatentable, abstract idea because they claim nothing more than the "longstanding," "routine," and "conventional" concept of using longer codes to increase capacity during wireless communications. *See id.*, 2356-59.

In assessing whether this claim is directed to an abstract idea, the Court must look past the claim language for the purpose of the claim to determine what the invention is trying to achieve. *Morales v. Square, Inc.*, 75 F. Supp. 3d. 716, 725 (W.D. Tex. 2014), *aff'd*, 621 F. App'x 660 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 1461 (2016). All Claim 3 explains is using existing methods to for CDMA wireless data communication. The claim is directed to the bare idea of using longer codes to increase capacity during wireless communications. That is an abstract idea ineligible for patenting.

The abstract idea inquiry begins by analyzing the "focus" of the claim, *i.e.*, its "character as a whole," in order to determine whether the claim is directed to an abstract idea. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018). For example, the Federal Circuit has

explained that this Court should examine the patent's "'claimed advance' to determine whether the claims are directed to an abstract idea." *Finjan, Inc. v. Blue Coat System, Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018). "In cases involving software innovations, this inquiry often turns on whether the claims focus on 'the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool.'" *Id.* (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016)).

Here, Claim 3 is not directed to any specific means or method for improving technology—it is directed to the abstract idea of using longer codes to increase capacity during wireless communications. The '783 Patent's stated goal was to "to provide a CDMA communication apparatus in the CDMA cellular system that, even in asymmetric communications with only the uplink, for example, can avoid a shortage of spreading codes on the downlink while carrying out open-loop transmission power control on the uplink." '783 Patent, 3:62–65. The solution provided by the patent is to select longer length hierarchic orthogonal spreading codes (which existed in the prior art) for asymmetric communications as compared to spreading codes used for symmetric communications, and that the codes to be orthogonal to spreading codes used for other asymmetric communication lines. *Id.*, at Cl. 3. But using longer length orthogonal spreading codes for asymmetric wireless communications is a concept, not an invention, and thus ineligible for patenting. *See, e.g.*, *Epic IP*, 351 F. Supp. 3d at 740 ("[T]he idea of a chat session separate from the original website is not an invention; it is a concept. The asserted claims . . . recite the concept, but not the way to implement it.").

The functional nature of Claim 3's limitations further supports its abstractness. In determining whether a particular claim is directed to an abstract idea, courts have focused on whether the claim is purely functional in nature rather than containing the specificity necessary to

recite how the claimed function is achieved. As Federal Circuit Judge Chen commented, "while not all functional claiming is the same, simply reciting a functional result at the point of novelty poses serious risks under section 101." *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 966 F.3d 1347, 1356 (Fed. Cir. 2020) (Chen, J., concurring) (citations omitted). For example, in *Investpic*, the court asked whether the claim had "the specificity required to transform [it] from one claiming only a result to one claiming a way of achieving it." *Investpic*, 898 at 1167. To answer that question, the Federal Circuit has directed courts to "look to whether the claims focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017); *McRO, Inc. v. Bandai Namco Games Am., Inc.,* 837 F.3d 1299, 1314 (Fed. Cir. 2016) ("We therefore look to whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoked generic processes and machinery."). Therefore, the question in such cases is "whether the claims are directed to 'a specific means or method' for improving technology or whether they are simply directed to an abstract end-result." *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017).

Claim 3 is directed to an abstract end-result. It lacks any of the specificity that the Federal Circuit has held is sufficient to confer patent eligibility. *Cf. Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999 (Fed. Cir. 2018) (holding eligible claims with the required specificity, but ineligible those without it); *Core Wireless Licensing S.A.R.L. v. LG Elec., Inc.,* 880 F.3d 1356, 1361–63 (Fed. Cir. 2018) (holding claims eligible where they were "directed to a **specific** improvement in the capabilities of computing devices") (emphasis added); *see also RecogniCorp*,

9

855 F.3d at 1326 (claims were ineligible because they were not directed to "a *specific* means or method for improving technology") (emphasis added). Claim 3 does not require a new or unconventional machine or process for using longer codes to increase capacity during wireless communications—it requires using longer length hierarchic orthogonal spreading codes for asymmetric communication over a CDMA wireless communication channel. "Inquiry therefore must turn to any requirements for *how* the desired result is achieved." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016). But Claim 3 does not describe how the desired result—using longer length hierarchic orthogonal spreading codes for asymmetric communication—is achieved. The mechanism to implement the idea is impermissibly unbounded in scope.

Claim 3 thus differs from the claims that the Federal Circuit has held to be eligible because they claimed specific means for improving specific computer technology or solving specific computer problems. For example, the Federal Circuit addressed the eligibility of claims directed to improving computer security in *Ancora Techs. v. HTC Am., Inc.*, 908 F.3d 1343 (Fed. Cir. 2018). In that case, the Federal Circuit held the claims eligible and stated, "Improving security—here, against a computer's unauthorized use of a program—can be a **non-abstract** computer-functionality improvement . . . done by a **specific technique** that departs from earlier approaches to solve a **specific computer problem**." *Id.*, 1348 (emphasis added). The court was persuaded because "[t]he claimed method here specifically identifies how that functionality improvement is effectuated in an assertedly unexpected way." *Id.* The same is not true of Claim 3. It does not require a specific and unconventional technique, and it does not identify any specific improvement to computer functionality, much less an unexpected way of effectuating such an improvement.

That Claim 3 is limited to a particular wireless communication environment, such as asymmetric CDMA wireless communications, does not alter this analysis. "Most obviously, limiting the claims to [a] particular technological environment . . . is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core." *Elec. Power Grp.*, 830 F.3d at 1354. Claim 3 is directed to an abstract idea even if its limitations require practicing that idea for asymmetric CDMA wireless communications.

The claimed advance of the claims of the '783 Patent is using longer codes to increase capacity during wireless communications is an abstract concept ineligible for patent protection.

3. ***Alice* Step 2: The claims of the '783 Patent do not contain an inventive concept to transform the abstract idea into patent-eligible subject matter.**

Because the claims of the '783 Patent are directed to an abstract idea, the Court must next determine whether the patent contains an "inventive concept sufficient to transform the claimed abstract idea into a patent eligible application." *Alice*, 134 S. Ct. at 2357 (internal quotations omitted). To pass this test, the '783 Patent "must include additional features" that "must be more than well-understood, routine, conventional activity." *Ultramercial*, 772 F.3d at 715 (quotation omitted). Here, the '783 Patent is broadly generic and does not contain meaningful limitations that would restrict it to a non-routine, specific application of the abstract idea.

Each of the steps and components recited in the '783 Patent is described only at a high level of generality. For example, representative Claim 3 recites the step of "select[ing] as the spreading code for asymmetric communications, a hierarchic orthogonal type spreading code . . . which contains spreading codes of a longer length than spreading codes used for symmetric communication lines and is orthogonal to spreading codes used for other asymmetric communication lines." '783 Patent, Cl. 3. That is nothing more that selecting one of the many

existing codes that were conventional at the time of the alleged invention. As the specification explains:

> If the transmission information indicates that the communication is asymmetric, the transmission rate is controlled to a low level as will be described later, and thus operating spreading code control section 1211 **extracts a spreading code included in a hierarchy of spreading codes longer than the spreading code used on the symmetric communication lines with reference to memory 1213.** The extracted spreading code is sent to code comparison section 1212 where it is compared with the spreading code in use which is controlled by operating spreading code control section 1211.

*Id.*, 6:4–13 (emphasis added). But in the prior art, "CDMA system use[d] codes with high orthogonality as spreading codes to suppress interference between spreading codes [to] allow[] the capacity of the system to be expanded" (*id.*, 3:11–14) and "[h]ierarchic type orthogonal codes such as Walsh codes [were] generated by combining generation matrices hierarchically . . . characterized by any two spreading codes in any hierarchy being mutually orthogonal" (*id.*, 3:39–42). Even the use of long codes was well-known in the prior art: "Therefore, in order to secure the number of spreading codes assigned to the user, a method of combining short codes which have the same cycle as the length of the information symbol and long codes which have longer cycle than that of short codes is adopted." *Id.*, 6:17–21.

Thus, Claim 3 of the '783 Patent is implemented on generic computer technology, performing conventional CDMA code spreading techniques, and therefore does not contain an inventive concept sufficient to confer eligibility. There is simply nothing "inventive" about using a longer length hierarchic orthogonal spreading code for asymmetric communications, all done by the use of generic off-the-shelf components. The abstract functional descriptions in the claims are devoid of any technical explanation as to how to implement the purported invention in an inventive way. *See In re TLI Commc'ns LLC Patent Litigation*, 823 F.3d 607, 615 (Fed. Cir. 2016) (claims failed *Alice*'s step 2 where specification limited its discussion of "additional functionality" of

conventional components "to abstract functional descriptions devoid of technical explanation as to how to implement the invention"). Similar to the invalidated claims in *Intellectual Ventures I LLC v. Symantec Corp.*, nothing in the claims of the '783 Patent "contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." 838 F.3d 1307, 1316 (Fed. Cir. 2016) (citing omitted).

Courts have repeatedly held that the presence of generic hardware and software like the kind recited in the claims of the '783 Patent does not make an otherwise abstract idea patent-eligible. *See, e.g.*, *buySAFE*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *Content Extraction*, 776 F.3d at 1348 ("At most, [the] claims attempt to limit the abstract idea of recognizing and storing information from hard copy documents using a scanner and a computer to a particular technological environment. Such a limitation has been held insufficient to save a claim in this context."). Claim 3 of the '783 Patent requires nothing more than use of generic computer technology to select longer length spreading codes for asymmetric communications. "Nothing in the claim[], understood in light of the specification, requires anything other than off-the-shelf, conventional computer . . . technology." *Elec. Power Grp.*, 830 F.3d at 1355. There is thus no limitation in Claim 3 that could be considered an inventive concept. *See, e.g.*, *Yanbin Yu, et al. v. Apple Inc. et al*, Case Nos. 2020-1760, 2020-1803, at 9-10 (Fed. Cir. June 11, 2021) ("Here, the claimed hardware configuration itself is not an advance and does not itself produce the asserted advance of enhancement of one image by another, which, as explained, is an abstract idea. The claimed configuration does not add sufficient substance to the underlying abstract idea of enhancement—the generic hardware limitations of claim 1 merely serve as a conduit for the abstract idea.") (quotations and citations omitted).

The other claims of the '783 Patent include similar limitations regarding the abstract idea, but they do not include the specificity necessary to claim patent-eligible subject matter. They also do not include anything other than generic components and processes such that they fail to contain an inventive concept. Accordingly, the other claims suffer from the same flaws as Claim 3. These claims also do not contain any inventive concept amounting to "significantly more" than the abstract idea. They do not inject any unconventional computer components or techniques. The claims simply apply the same abstract concept of using longer codes to increase capacity during wireless communications, and the Federal Circuit has been clear that the abstract idea itself cannot confer an inventive concept. *See BSG Tech*, 899 F.3d at 1290 ("It has been clear since *Alice* that a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept.").

### 4. There are no claim construction or factual disputes preventing a ruling on this issue at the Rule 12 stage.

The issue of the patent eligibility is ready for the Court's consideration because there are no factual or claim construction issues. This case is markedly different from *Berkheimer* and the line of cases where factual issues have been found to exist in *Alice* Step 2. In *Berkheimer*, the Federal Circuit noted that the specification explicitly "describe[d] an inventive feature that store[d] parsed data in a purportedly unconventional manner." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018). The court added that "[t]he improvements in the specification, to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities . . . so we must analyze the asserted claims and determine whether they capture these improvements." *Id.* After finding that some claims "contain limitations directed to the arguably unconventional inventive concept described in the specification," the court held that there was a question of fact as to whether those claims perform

14

"well-understood, routine, and conventional activities." *Id.* at 1370. Here, in contrast, there is no factual dispute whether the claims of the '783 Patent include an inventive concept, and Nitetek has not alleged that any such inventive concept exists.

## IV. CONCLUSION

For the foregoing reasons, EVBox respectfully requests that the Court dismiss Nitetek's claims for failure to state a claim upon which relief can be granted. Because leave to amend would be futile, EVBox requests dismissal with prejudice.

Dated: July 6, 2021

                                **FISH & RICHARDSON P.C.**

                        By: */s/ Excylyn J. Hardin-Smith*
                            Excylyn J. Hardin-Smith (EHS7780)
                            hardin-smith@fr.com
                            7 Times Square, 20th Floor
                            New York, New York 10036
                            Tel: (212) 765-5070
                            Fax: (212) 258-2291

                            Neil J. McNabnay
                            Ricardo J. Bonilla
                            Rodeen Talebi
                            1717 Main Street, Suite 5000
                            Dallas, Texas 75201
                            (214) 747-5070 (Telephone)
                            (214) 747-2091 (Facsimile)
                            mcnabnay@fr.com
                            rbonilla@fr.com
                            talebi@fr.com

                            COUNSEL FOR DEFENDANT
                            EVBOX NORTH AMERICA INC.